## Teegarden v. Webster et al.

February 11, 1947.

' W. Bridges White, Judge.

Prewitt & Prewitt and F. C. Bryan for appellant.

Lewis A. White for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

This appeal is from a judgment on a directed verdict in favor of the appellees at the conclusion of the appellant's evidence. Mrs. Teegarden instituted the action to have set aside the will of her deceased sister, Mary Eliza Webster, on the grounds of undue influence and mental incapacity. The decedent was also a sister of the appellees, Sallie Webster and George Webster. She died in 1944 at the age of 48. The will under attack was executed in 1930. At that time the decedent was living with her mother at the home place. The appellees, neither of whom had ever married, had lived at the home place until about 1928, at which time they moved to another house on the farm some quarter of a mile distant. They did not return until the death of their mother in 1933, and from that time on the decedent made her home with them. Mrs. Teegarden, who married when Mary

Eliza was some four or five years of age, lived about a quarter of a mile distant from the home place and was a frequent visitor there.

The will was prepared by a highly competent and reputable attorney, who is now dead, as are both of the attesting witnesses. It was simple in its form and, after directing that all debts be paid, it was provided that Mrs. Teegarden be given $50 and the remainder of the estate divided between the appellees. The extent of the estate is not shown in the record, but we gather from the briefs that it consisted of an interest in several pieces of real estate as well as a sizable personal estate.

In a well-prepared brief the appellant contends that her case was one for the jury, especially on the question of undue influence. Some 18 lay witnesses testified in general that Mary Eliza virtually lived in seclusion; that she had the mind of a child and while she knew her relatives she did not know the extent of her estate; and that she did not transact her own business. Most of them said they thought she lacked testamentary capacity. Early in her youth the decedent had diphtheria and scarlet fever. These diseases left her hard of hearing and with a decided impediment in her speech. She attended school for several years, but accomplished little more than learn to read and write. Her school teacher said that as she remembered she was very slow to learn and made little progress. She rarely, if ever, went to Mt. Sterling except in the company of one or both of the appellees. While she assisted with the housework, it is quite evident that her mother looked after her business until her death and thereafter it was attended to by the appellees. No witness testified to any fact or facts other than heretofore mentioned upon which they based their opinions. It strikes us that, instead of the testimony showing particular facts which would indicate mental incapacity, it tended to show the physical condition, conduct and habits of Mary Eliza. She was able to read and write and do housework. Living in virtual seclusion is not of itself a sign of mental incapacity. As a matter of fact the appellees have lived in somewhat the same manner. Deafness and retarded speech are physical and not mental handicaps. It may be that the diseases affected the decedent's mind to some extent, but the question is, Did they destroy her testa-

mentary capacity? She may not have known the extent of her estate, but this would not necessarily show mental incapacity. The fact that she did not transact her business would not of itself show mental incapacity, because it is quite a common occurrence for women to leave their business affairs to trusted relatives. As indicated in Moore v. Moore, 290 Ky. 715, 162 S. W. 2d 547, the same level of mental capacity is not required to make a will as to make a contract or transact business. There is no indication that she was in any way overreached or taken advantage of. As a matter of fact she had her own bank account and bought her own clothes. Her physical handicaps were such that it was quite proper that some one accompany her on her infrequent visits to Mt. Sterling. Doubtless she was timid and desired the companionship of her brother and sister when she went to town. While it is intimated that the appellees were with her when the will was made, the record is silent on that point. Of her own volition, or through the advice of her mother or other members of the family, she had sense enough to have her will drafted by a highly competent and reputable attorney. While we have not decided the case on this point, it would take a good deal to convince this Court that the attorney would have prepared a will for a person whom he thought lacked testamentary capacity.

A wide range of proof is allowed when a will is attacked upon the grounds of undue influence and lack of mental capacity. Welch's Adm'r v. Clifton, 294 Ky. 514, 172 S. W. 2d 221, 148 A. L. R. 1220. We have frequently pointed out that it is sometimes quite difficult to bring forth specific facts showing undue influence. This case is one where the contestant is shouldered with a very heavy burden. The will was made some 16 years ago and the decedent lived in virtual seclusion. However, Mrs. Teegarden was a frequent visitor to the home place and she had ample opportunity to see whether the appellees were in any way mistreating or overreaching her sister. There is no charge that they were unkind to her or that she was not thoroughly content to live with them.

It is earnestly insisted that the will was an unnatural one, and the case of Hagedorn v. Scott, 228 Ky. 582, 15 S. W. 2d 479, is cited in support of the proposition that,

while discrimination of equally deserving relatives is not of itself sufficient ground for setting aside a will, this, coupled with other evidence indicating a lack of some of the essential elements of testamentary capacity, and evidence of undue influence, may afford an adequate basis for a verdict against the will. The charge of unnaturalness is that Mrs. Teegarden was not placed on equal footing with her brother and sister, and that the mother was omitted entirely. We take just the opposite view of the will, for it seems to us to have been a quite natural one. The decedent's mother had a considerable estate and it is only natural for a child, in the absence of some ailment or affliction which would indicate to the contrary, to think she would outlive her parents. Prior to the preparation of the will the decedent had lived with the appellees all of her life, with the exception of two years. Apparently, she was fond of them and had leaned on them heavily because of her afflictions. Mrs. Teegarden was married, had a home of her own and a husband upon whom she could depend for her support. Furthermore, Mary Eliza either knew of her own accord or was properly advised that, in the event her mother predeceased her, she would in all probability make her home with the appellees. On the whole we think the appellant failed to make out a case on the charge of mental incapacity.

As we view the evidence on undue influence we think it even weaker than that on the lack of mental capacity. As said in the case of Ecken's Ex'x v. Abbey, 283 Ky. 449, 141 S. W. 2d 863, undue influence to avoid a will must be such as to destroy the free will of the maker, though we have held that, where the charge is coupled with lack of mental capacity, the evidence does not have to meet the same test as would be applied if the charge stood alone. Welch's Adm'r v. Clifton, supra. Unquestionably, there was ample opportunity for the appellees to exercise undue influence upon their sister, but opportunity alone is not sufficient. Karr v. Karr's Ex'r 283 Ky. 355, 141 S. W. 2d 279. It must not be overlooked that, for some two years prior to the time the will was executed, the appellees were not living in the same home with the decedent. Furthermore, if the appellant on her frequent visits to the home place had seen any indication that her deceased sister was being unduly influenced by

the appellees, certainly she would have so testified. She and the other members of her family, who were in the best position to know of the exercise of any undue influence, mentioned no specific instance when they thought it was being exercised.

Lastly, it is contended that evidence relating to a sanity inquest held in 1939 should have been admitted, principally because all the evidence tended to show that throughout her life Mary Eliza was said to have the mind of a child. The inquest which the appellees contend was void resulted in Mary Eliza being declared incompetent. This inquest was held nine years after the will was made and, for reasons heretofore set forth, aside from its remoteness, we believe it was proper to exclude it. Reliance is placed by the appellant upon the case of Oder's Ex'r v. Webster, 224 Ky. 551, 6 S. W. 2d 690. In that case it was held that the testimony given by a doctor at a sanity inquest should have been admitted, because it showed that the affliction to which he testified and which he described as one which came on slowly but surely after it once developed would eventually result in entire mental destruction followed by death. We think the facts in the case at bar are clearly distinguishable from those in the Oder case.

For the reasons indicated the judgment should be and it is affirmed.