PRICHARD v. KITCHEN et al.

Court of Appeals of Kentucky.

June 15, 1951.

Rehearing Denied Nov. 21, 1951.

H. R. Wilhoit, Grayson, for appellant.

Thos. D. Theobald, Jr., Grayson, for appellee.

SIMS, Justice.

This action was instituted by May Prichard, a daughter of James B. Kitchen, who died Sept. 6, 1948, against his other children, Dallas Kitchen, Ellis Kitchen, Martha Kitchen, Lena Rapaz and Dell Hammons, to contest decedent's will. The jury found for the will, and six grounds are assigned for reversal: 1. The paper does not substantially comply with the "statute of wills, either in its form, execution or attestation"; 2. it is the product of an insane delusion; 3. the court erroneously ruled on evidence; 4. erroneous instructions were given; 5. the court erroneously refused to instruct on undue influence; 6. improper argument of counsel for appellees.

Testator left an estate of about $40,000, mainly real estate. The original paper in contest is in the record. It was drawn by F. A. Easterling, a notary public, on a printed form. All the language purporting to make disposition of decedent's property appears on the front page, with a blank space of approximately four inches below the last clause. There is no residuary clause. The clause appointing an executor, the testimonium, the name of testator, the attestation clause with the names of the witnesses, are on the back, or reverse, side of the printed form.

In 1946 testator had gone to Grayson, some 15 miles from his home, and employed Mr. Easterling to write four deeds for him conveying the greater part of his real estate to his wife and children, except appellant. All the deeds were not delivered, but some were held by the decedent among his papers.

On Feb. 16, 1948, testator sent one of his sons for Mr. Easterling and for Luster Green and Fred Green, his neighbors. At that time Mr. Kitchen was 86 years of age; was confined to his bed; was unable to read, on account of poor eyesight; and was unable to hear, except when spoken to in a loud voice. When Easterling came, the old man told him how he wished his will drawn and asked that it be prepared according to his directions. The way Mr. Kitchen dictated, Easterling "would write some and then he would ask him what else he wanted in it and Jim (Kitchen) would tell him and then he would go ahead and write that". After Easterling had typed the will in testator's presence, he read it "paragraph by paragraph" to him, and Mr. Kitchen approved the will as written, and said that "was the way he wanted it".

When Easterling had typed and read the will to Kitchen in the presence of witnesses, and testator had approved it, Easterling told him, "this is ready to sign". Kitchen said, "I can't see to write, you will have to do the writing." Mr. Kitchen then put his hand on the pen as Easterling wrote his name at the proper place. When Luster and Fred Green came in testator's room, someone told him that Luster and Fred Green were there "for witnesses". Kitchen said, "That is all right," he "wanted the will witnessed". Testator signed the will in the presence of Luster Green and Fred Green who then, in his presence, signed the will as witnesses.

The members of this Court have examined the original will. There is a space between the last disposing clause and the testimonium clause, but we do not find anything, either from the examination of the original will or from the testimony, indicating any irregularity because of this. See, Lucas v. Brown, 187 Ky. 502, 219 S.W. 796.

It appears that Easterling signed the testator's name at the proper place between the testimonium clause and the attestation clause at the direction of the testator and at a time when testator had his hand on the pen as Easterling wrote his name. Where a person's name is signed for him at his direction and in his presence by another, the signature becomes his own and has the same effect as though written by the person himself. KRS 394.040; Widick v. Pursifull, 299 Ky. 773, 187 S.W.2d 447.

The testator signed the will in the presence of Luster and Fred Green, and they in turn signed it as witnesses in his presence. This, under the facts, was a substantial compliance with KRS 394.040. Rybolt v. Futrell, 296 Ky. 158, 176 S.W.2d 269. The will in its form, execution and attestation substantially complies with KRS 394.040.

The testator devised lands to his sons, Ellis and Dallas; to his daughters, Lena and Martha, and to Dell Hammons, whom he refers to as "my son". He did not devise any land to his daughter May, appellant, but devised to her only $1,000 to be paid by his sons Ellis and Dallas. She says this was because of an insane delusion under which her father was laboring that her husband, Charles Prichard, and certain of his relatives, had grossly wronged him.

It appears that testator had agreed to lease appellant's husband some land, which the former understood was to be five acres, but the lease when prepared was for more than five acres. The coal under two tracts

of land owned by Mr. Kitchen had been conveyed years ago by his father to two iron companies which operated in Carter County. Later a Mr. Cornett acquired the coal which for several years before this action had been held by his devisees. Appellant's husband leased some of the coal from the Cornetts. Testator, believing that he was the true owner of the coal, brought an action against the Cornetts. Appellant's husband gave up his lease and worked with Mr. Kitchen in the law suit. The Cornetts won, and Mr. Kitchen got the idea his son-in-law was working with the Cornetts and against him in that action. Mr. Kitchen on occasions stated that Bud Prichard and Watt Prichard of Carter County, close relatives of Charles Prichard, "had done him wrong". On account of these things, he came to dislike his son-in-law.

At the trial Dr. Townsend, a witness for appellant, in answer to a hypothetical question stated that in his opinion Mr. Kitchen, at the time of the execution of his will on Feb. 16, 1948, was of unsound mind and was under an insane delusion with respect to Charles Prichard and Charles Prichard's relative, and of unsound mind on that subject. Dr. Keffer, a witness for appellees and who had been a practicing physician since 1891, stated he was at a hospital in Ohio for three years where they "had all forms of insanity" and where he dealt with insane people every day. He had known Mr. Kitchen for several years and he "was an unusually strong man, and I thought strong in mind. * * * He was an unusual man". Asked the same question propounded to Dr. Townsend, Dr. Keffer stated that in his opinion Mr. Kitchen was of sound mind. A number of Mr. Kitchen's neighbors say that in their opinion he was of sound mind.

■ In Coffey v. Miller, 160 Ky. 415, 169 S.W. 852, 854, we said: "An insane delusion is an idea or belief which springs spontaneously from a diseased or perverted mind without reason or without foundation in fact; it is distinguishable from a belief which is founded upon prejudice or aversion, no matter how unreasonable or unfounded the prejudice or aversion may be.

If it is the product of a reasoning mind, no matter how slight the evidence upon which it is based, it cannot be classed as an insane delusion. In everyday life men of the strongest minds, being in possession of the same facts, reach different conclusions. In this case Miller, being presumably in possession of at least as much knowledge about these occurrences as his relatives and neighbors, reached a different conclusion as to who were the guilty parties, and the fact that he reached a different conclusion from most of his relatives and neighbors does not make his belief an insane delusion."

For other cases see 19 West Ky. Digest, Wills, ☞38, subsections 1 and 3; Also see Page on Wills, Vol. 1, sections 140–146.

■ There is an inequality in testator's distribution of his estate, but that is not sufficient to take the case to the jury on undue influence. There was, perhaps, opportunity for the exercise of undue influence, but there is no proof that such influence was exercised. It appears that testator, by the deeds which he had Easterling write some years before he dictated his will to him, had a fixed purpose as to the disposition of his property. We do not believe the trial court erred in refusing to give an instruction on undue influence.

■ The trial court under the evidence was right in submitting but two issues to the jury; (a) whether the testator had sufficient mentality to make a will, and (b) whether he was laboring under an insane delusion in reference to mistreatment at the hands of his son-in-law, Charles Prichard, and the will was induced thereby. These two issues were submitted in instructions 1 and 2, which are substantially correct. The second instruction deals with insane delusions and appears to have been taken from "Stanley's Instructions to Juries", § 756, p. 1022. The court gave these two proper instructions right before adjourning for the noon recess and immediately upon court reconvening for the afternoon session gave instruction E which reads: "The court instructs the jury that an insane delusion,

such as to render the will in contest invalid, is as. follows: As.a belief in things which do not exist, and which no rational mind would believe to exist. The essence of an insane delusion is that it has no basis in reason and cannot be dispelled by reason. The subject matter must have no foundation in fact, for there is no such thing as a delusion founded on facts. It must not be founded on evidence, for if there is any evidence, however slight, or inconclusive, which might have a tendency to create the belief, such belief is not a delusion. Nor can one be said to act under an insane delusion if this condition of mind results from an inference or a process of reasoning, however illogical, drawn from facts which are shown to exist. A delusion is therefore to be distinguished from a mere mistake of opinion. An insane delusion is not established when the court is able to understand how a person situated as the testator was might have believed all that the evidence shows that he did believe and still have been in full possession of his senses. A false belief, even in facts which actually did not exist, or a belief which a rational person may entertain, does not constitute an insane delusion. Nor are absurd opinions, however unfounded, insane delusions."

■■■ The purported instruction E was not an instruction on insane delusions but was a dissertation or argument on the subject. The only purpose it could serve was to confuse the jury. We take this sentence from the instruction: "An insane delusion is not established when the court is able to understand how a person situated as the testator was might have believed all that the evidence shows that he did believe and still have been in full possession of his senses."

The jury with reason might have inferred from the quoted sentence that the court could understand how testator might have believed his son-in-law mistreated him. In a vigorous argument to the jury, counsel for appellees stress this erroneous instruction. The vital issue in the case was whether testator was suffering from an insane delusion that his son-in-law had mistreated

him and this argumentative instruction on that issue was prejudicial to appellant, especially when it was given by the judge upon reconvening of court for the afternoon session when he had just previous to the noon recess properly instructed the jury on the question.

■■■ Who can say that the jury was not influenced by instruction E and that it might not have returned a different verdict if this instruction had not been given and argued to the jury? The rule is that generally an erroneous instruction is presumed to be prejudicial to appellant, and the burden is upon appellee to show affirmatively from the record that no prejudice resulted; and when the appellate court cannot determine from the record that the verdict was not influenced by the erroneous instruction, the judgment will be reversed. Trevillian v. Boswell, 241 Ky. 237, 43 S.W. 2d 715; Louisville R. Co. v. Lenehan, 253 Ky. 489, 69 S.W.2d 1017.

■■■ Over the objection of appellant the court permitted appellees to introduce in evidence a writing signed by appellant to the effect that she waived legal notice of the probate of the will and consented that it might be probated as effectually as if she were present in court. This instrument was just a waiver of the notice of the probate proceeding and had no place in this case contesting the will. True, the court refused appellees' offered instruction that this paper estopped appellant from contesting her father's will, but it is not difficult to see that the jury might have considered it as working an estoppel against appellant. On another trial this paper will not be introduced in evidence.

■■■ Numerous objections were made by appellant to the argument of appellee's counsel, some. of which were sustained and others not ruled upon. When counsel makes an objection, he is entitled to have the court rule thereon. However, if counsel does not insist upon the court ruling upon his objection, the same is considered waived. City of Somerset v. Gardiner, 228 Ky. 512, 15 S.W.2d 303; Wilson v. Dalton's Adm'r, 311 Ky. 285, 223 S.W.2d

978; Empire Taxi Service v. Hagan, 290 Ky. 821, 162 S.W.2d 177. On another trial the court should confine counsel in their argument to the evidence, and should objections be made, he will rule thereon and should he fail so to do, counsel must insist upon a ruling, and save an exception thereto, in order to raise the question on appeal.

The judgment is reversed for proceedings consistent with this opinion.